Schmidt v. McBean.

---

### Ida E. Schmidt v. Emma A. McBean et al.

1. GUARDIANS—*Power of Sale over the Ward's Personal Property.*—A guardian has the power to sell the personal property of his ward without an order of court, except where such sale is prohibited by statute, and he will be liable on his bond for any abuse of this power; but the purchaser will take a good title unless he has notice of the guardian's fraud.

2. FRAUD—*Where One of Two Innocent Parties Must Suffer.*—Where one of two innocent parties must suffer a loss, the consequences must ultimately rest upon the one whose conduct made it possible for the loss to occur.

Bill to Set Aside an Assignment of a Judgment.—Appeal from the Superior Court of Cook County; the Hon. PHILIP STEIN, Judge, presid-

ing. Heard in the Branch Appellate Court at the October term, 1900. Affirmed. Opinion filed November 26, 1901.

**Statement.**—This is a bill to set aside certain alleged assignments of a judgment for $5,000, recovered by appellant against the city of Chicago, in the Superior Court.

At the time the judgment was obtained appellant was a minor, and one George M. Shaver was appointed and acting as her guardian. Her claim against the city had been prosecuted by a corporation known as the " People's Casualty Claim and Adjustment Company," employed for the purpose by appellant's parents. The president of this company was one Charles W. Beck. It was at the suggestion of said Beck, acting for the adjustment company apparently, that Shaver was appointed appellant's guardian. Complainant attained legal age in 1897. About a month thereafter, August 11, 1897, her said guardian filed a report in the Probate Court, stating that the judgment was still unpaid and asking to be discharged upon assigning it to appellant. An assignment of the judgment was accordingly executed and turned over to her through said Beck, president of the investment company, who, it subsequently appeared, had already disposed of the same judgment, and received the money therefor more than two years before, meanwhile concealing the fact and apparently appropriating the money to his own use. When delivering the assignment to appellant he is said to have represented to her that the judgment would be paid in about two years. In February, 1899, he wrote that he would look up the matter and see when the judgment would be paid; and again that he had not been able to find out its exact status, but was " quite surprised " to find there had been several transfers, and would " take steps to enforce payment to you." Appellant, becoming suspicious, caused an investigation, and learned that a paper purporting to be an assignment of the judgment to one Ames H. Perkins, executed by Shaver, her guardian, dated March, 1895, two years before his discharge as such guardian, had been filed with the clerk of the court, and that subsequent assignments had been made

Schmidt v. McBean.

by Perkins to one Duncan S. McBean, by McBean to the
Commercial National Bank, by the bank to McBean again,
and by the latter to one J. H. Pearson.    Further investiga-
tion developed that the assignment by Shaver, the guard-
ian, to Perkins, was made under an order of the Probate
Court entered in March, 1895, authorizing such sale for
$4,375, which sum Perkins had offered through Beck, the
president of the adjustment company.    It appears that
the guardian had deposited the assignment with the North-
ern Trust Company Bank for delivery to Perkins upon
payment of the sum agreed upon as above.    Finding some
days after, that Perkins had not paid the money as expected,
the guardian took the assignment from the bank, and sub-
sequently, as he testifies, handed it to a stenographer
employed by the adjustment company, asking her to put
it away in the company's vault, which she did, placing it
in a large envelope, it is said, with other papers belonging
to Shaver, said to have been there for safe keeping.    At a
period considerably later, Beck, who had then sold the judg-
ment to Perkins and received the money, is said to have
told the guardian that there was no immediate prospect
of the consummation of the sale; and Shaver paid no further
attention to the matter until the question of ownership
arose, in December, 1898, having meanwhile, in August,
1897, closed his accounts as guardian, and executed a new
assignment of the judgment to appellant.    There is evi-
dence tending to show that Beck, the president of the
adjustment company, took the original Perkins assign-
ment from the vault and delivered it to Perkins, and
received therefor the sum of $4,375, by a check payable
to Beck's own order, dated March 23, 1895.    Apparently,
therefore, Beck had received the money nearly four years
before appellant discovered the facts.

Appellant filed her bill of complaint seeking to set aside
the assignments to Perkins and his assignees, and recover
the interest which had meanwhile been paid by the city
upon the judgment.    Appellees answered denying the alle-
gations of the bill, and claiming good title to the judgment.

The Superior Court upon the hearing dismissed the bill for want of equity, and from that decree this appeal comes.

DEFREES, BRACE & RITTER, attorneys for appellant.

GEORGE SAWIN, attorney for appellees.

MR. PRESIDING JUSTICE FREEMAN delivered the opinion of the court.

It is first contended by counsel for appellee, that the guardian had no power to sell or authorize the sale of the judgment, and that the Probate Court had no power to authorize or direct such sale. The statute (Chap. 64, Sec. 17), provides that "The guardian shall settle all accounts of his ward and demand and sue for, and receive in his own name as guardian, all personal property and demands due the ward, or with the approbation of the court compound for the same, and give a discharge to the debtor upon receiving a fair and just dividend of his estate and effects." The argument is that this statute is a limitation upon the common law powers of guardians; that if, before the statute, the guardian might have compounded, released or sold the ward's choses in action, he can now do only what is in accordance with the exact terms of the statute; that the statute now requires him to demand and sue for the ward's claims, and does not allow him to sell them to third parties at a discount.

That a guardian has the power to sell the ward's personal property without an order of court except where such sale is prohibited by statute, seems to be unquestioned. He will be liable on his bond for any abuse of this power, but the vendee will take a good title unless he has notice of the guardian's fraud. The power to sell is said to extend to a note or debt including a mortgage securing the same. (Woerner's Am. Law of Guardianship, p. 179; Am. Eng. Ency. of Law, Vol. 15, p. 56.) It is argued, however, that inasmuch as the statute of this State above quoted affirmatively requires the guardian to "demand, sue for and receive * * * all personal property and demands due the ward,"

these positive requirements exclude the common law right to sell a chose in action.    In support of this view reference is had to Hayes v. Mass. Life Ins. Co., 125 Ill. 626.    In that case it is held that while at common law, a guardian might have compromised or submitted to arbitration claims and demands due the ward's estate, "it is manifest that when the legislature in the section referred to, undertook to define the powers and duties of guardians, and expressly provided that as to demands due the  ward the guardian might 'with the approbation of the  court  compound  for the same and give a discharge to the debtor, a change and modification of the common  law  was  intended.  If  before  this  statute  the guardian might, in the exercise of his own honest discretion, compound and release a demand due his ward, after the passage of this statute he was clearly required to procure the approbation of the  proper  court before  exercising  such power;" and it is said that this statutory requirement "was intended by the legislature  as  an additional safeguard and protection to  the ward," etc.    This language is used with reference to the last part of the section referred to, viz., that which authorizes the guardian to "compound" for demands due the ward, with the approbation of the court.    The case holds  that  such  composition  can  not  be  had  under  the statute except with the "approbation of the court."    But in the  same  decision, reference  is made to an earlier case (Bond v. Lockwood, 33 Ill. 212), in which it was held the statute in question "was not designed and did not constitute a complete code, and that the purpose of the legislature was to confer upon the Probate Court the power to appoint guardians and  to  regulate their conduct according to the common law."    In Bond v. Lockwood the court says that " while some of its (the statutes) provisions were declaratory of the  common law and were appropriately introduced in conferring jurisdiction upon  a new tribunal, it is evident that many of the powers and duties, rights and liabilities of guardians are not  by the statute  specifically defined.    The statute contains such provisions as were necessary to define the  nature of the  jurisdiction  conferred,

prescribe the manner of its exercise, and correct some of the defects of the law as it then existed. In other respects the common law regulating the powers and duties, rights and liabilities of guardians was left in force." If, then, the common law regulating the powers of guardians was left in force notwithstanding the statute in question, the power of sale, one of these common law powers, must still be regarded as in full force and effect.

It is, however, urged that the assignment of the judgment was never delivered by the guardian to Beck, from whom the assignee, Perkins, received it. The evidence upon this point, however, we are compelled to conclude justifies the conclusion apparently reached by the learned chancellor in the Superior Court, that the assignment was left by the guardian in the hands of or at least subject to the disposition of Beck, the president of the casualty company. The latter seems to have represented the guardian in the whole conduct of the case. The guardian was appointed and acted as such at the request of said Beck, and it was the latter who conducted the negotiations with Perkins, purchaser of the judgment, and made out the assignment. Beck seems to have acted in the matter as the attorney and agent of the guardian all the way through, and while he deceived the guardian afterward and concealed the fact that he had collected the money for which the judgment was sold, yet it does appear that the assignment was in his hands and subject to his control in the same way as were other papers left with the casualty company in cases where Shaver acted as guardian. It is true, the guardian says, that in the event the deal went through, he "was to receive the papers," and that Beck was to let him know "if the deal would be consummated." But he also testifies that " nothing was said in Beck's office as to what was to become of those papers if Perkins got ready to consummate the deal; they were simply deposited there for safe keeping." It is clear, at least, that it was the guardian's conduct in leaving the assignment with the casualty company under Beck's control, that made it possible for the loss to occur. " The

principle is that when one of two or more innocent persons must suffer loss, upon him whose conduct made it possible for the loss to occur, must the consequences ultimately rest." Sroelowitz v. Schultz, 86 Ill. App. 341, 347, and cases cited.

It appears that Perkins paid for the assignment of the judgment by a check payable to the order of Beck, and not payable to the order of the guardian. But in view of the conclusion that the guardian fully trusted Beck, and left the assignment with him, so that it might be used in case Perkins should decide to consummate the purchase, the fact that the money was paid directly to Beck, who appeared to have authority to collect, and apparently did have, while perhaps not in a high degree prudent on Perkins' part, can not be regarded as invalidating the purchase.

It is urged that the assignees should not be allowed to retain out of the judgment they purchased more than the actual consideration paid therefor. But if the sale to Perkins was valid, he acquired title thereby to the judgment as it stood. We are unable to find any sufficient ground for depriving his assignees of any part of their purchase. The judgment must be affirmed.